645 A.2d 939

**BOROUGH OF NORRISTOWN, Petitioner,**

v.

**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 4, 1994.

Decided July 12, 1994.

Reargument Denied Sept. 8, 1994.

Petition for Allowance of Appeal Withdrawn Aug. 26, 1994.

Petition for Allowance of Appeal Denied Dec. 12, 1994.

Gary R. Egoville, for petitioner.

Pamela Darville, Asst. Chief Counsel, for respondent.

Richard C. Sheehan, for intervenor.

Before COLINS and NEWMAN, JJ., and DELLA PORTA, Senior Judge.

COLINS, Judge.

The Borough of Norristown (Borough) petitions for review of the April 29, 1993 order of the Pennsylvania Human Relations Commission (Commission) adopting the decision of the Commission's permanent hearing examiner that sustained allegations of sexual discrimination filed by Mary S. Ralston (Ralston) in connection with her termination from employment and failure to be hired by the Borough as finance director. We reverse.

## FACTUAL BACKGROUND

On March 16, 1981, Ralston began working for the Borough as Borough treasurer/finance officer. The record indicates that prior to working for the Borough, Ralston's educational and work experience included: an associate degree in business administration; experience as a legal secretary; experience as a township secretary/treasurer; and experience in the area of tax collection and census taking for a school district board of directors.

In November 1985, the Borough adopted a home rule charter (Charter) and, on February 19, 1986, it adopted an accompanying administrative code (Code). Section 1207B of the Charter provided:

It is the intent of the Charter that qualified employees of the Borough be reappointed to the same or similar positions consistent with this Charter and the Administrative Code.

Under Section 503E of the Charter, the mayor, along with the advice and consent of the Borough Council, has authority to make key Borough appointments, such as that of finance director, who reports to the municipal administrator and is responsible for: (1) the Borough's financial operations; (2) the Borough's tax collection; (3) the Borough's operating plan and

budget, and its capital plan and budget; (4) all Borough financial receipts and disbursements; (5) Borough licensing; and (6) such other duties as are required by the Code, local ordinance, or the municipal administrator. Finding of Fact No. 77 in the Commission opinion states that "it was the intent of the Government Study Commission [ (formed to evaluate all functions of Borough government and to draft the Charter) ] that the duties Ralston performed be performed by the Director of Finance."

By letter dated November 8, 1985, Ralston informed Mayor Marberger (Mayor) that she was interested in the finance director position established by the Charter. The record is unclear as to whether Ralston formally applied for the job at that time, but she neither received a response nor was interviewed for this position. In any event, on December 30, 1985, the Borough advised Ralston that, effective January 3, 1986, her employment with the Borough would be terminated and that, effective January 6, 1986, pursuant to the Charter, the position of borough treasurer, which Ralston held, would be eliminated.

At the time of Ralston's termination, her salary was $32,000 plus benefits. It is alleged that during her employment, Ralston accrued retirement benefits paid by her own and Borough contributions for a period of six years, nine months, and 14 days, which contributions were forfeited as a result of her termination. The record further indicates that after termination, Ralston tried to find alternative work through want ads and job referrals from the Pennsylvania Office of Employment Security. After initially receiving unemployment benefits for 26 weeks and subsequently receiving monthly social security benefits in the amount of $402, Ralston found part-time employment with C.E. Refractories.

On January 6, 1986, the Borough hired Benjamin Dreby, a University of Pennsylvania Wharton School graduate with prior banking experience, as finance director, from which position he resigned in 1987. Subsequently, in April of 1987, the Borough advertised for the vacant position as follows: "The borough ... is seeking an experienced professional

Finance Director ... Direct municipal finance management highly desirable." At this juncture, Ralston formally applied for the finance director position. However, by a letter dated June 19, 1987 from John Plonski, borough administrator, Ralston was advised that the Mayor had nominated someone else for the position, although she had been a finalist from over 40 applicants, "which spoke highly of her qualifications."

## PROCEDURAL BACKGROUND

On or about May 2, 1986, Ralston, as a result of having been rejected for the Borough's new finance director position, filed a complaint with the Commission alleging sex-based discrimination against the Borough in violation of Section 5(a) of the Pennsylvania Human Relations Act (Act).[1] The Commission found merit in Ralston's allegations and encouraged resolution of the matter through conference and conciliation between the parties. When these efforts failed, a public hearing before a permanent hearing examiner was held on March 11, 12, and 13, 1992, during which Ralston and the Borough were respectively represented by counsel.

On April 29, 1993, the Commission adopted and incorporated into the permanent record, the stipulations of fact, findings of fact, conclusions of law and opinion of the permanent hearing examiner and ordered the following: (1) That the Borough cease and desist from sex-based discrimination with regard to hiring; (2) that the Borough pay Ralston, within 30

---

1. Section 5(a) of the Act, Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. § 955(a), provides:

   It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon membership in such association or corporation, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:

   (a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability ... to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract....

days of the effective date of the order, the lump sum of $186,727.03, as lost back pay for the period from January 6, 1986 to March 15, 1992, reduced by earnings from other employment and social security benefits Ralston received; (3) that the Borough pay additional interest of six percent per annum on the back pay award calculated from January 6, 1986 until payment is made; (4) that the Borough offer Ralston the position of finance director; (5) that in the event Ralston accepts the offered finance director position, the Borough make appropriate contributions to Ralston's retirement plan as if she had been continuously employed by the Borough since March 1981; (6) that in the event the finance director position is currently filled and cannot be offered to Ralston, the Borough pay her "front pay," from the date of the order until such time as the Borough is able to offer her the position, in an amount equal to the finance director's current salary, less any amounts Ralston earned from other employment and social security benefits; and (7) within 30 days of the effective date of the order, that the Borough report to the Commission regarding its compliance therewith. The Borough has appealed.

## DISCUSSION

The Borough emphasizes that the Charter eliminated the treasurer position Ralston had held, replacing it with the more responsible position of finance director, appointed by and reporting directly to the Mayor. With regard to Ralston's application for this position and the Borough's subsequent selection of another candidate, the Borough argues that Ralston failed to establish a *prima facie* case of sex-based discrimination, because she did not prove all of the following required elements: (1) That she belonged to a protected class; (2) that she applied for and was qualified for the job at issue; (3) that despite her qualifications, she was rejected; and (4) that the position was filled by a member of an unprotected class with the same qualifications as her own. The Borough further contends that Ralston's limited educational background precluded her from being qualified for the job of

finance director and that the academic qualifications and banking experience of Benjamin Dreby, who was chosen for the position, clearly surpassed her qualifications. In addition, referring to a memorandum sent from the Borough manager to Ralston, the Borough points to problems with Ralston's job performance, specifically with her duplication of payments to Borough creditors on several occasions, and with her adamant refusal to follow the Borough manager's directions for resolving a fund shortage situation until she had received the advice of the Borough's solicitor. For the foregoing reasons, therefore, the Borough maintains that: (1) Ralston failed to present credible or sufficient evidence of sex discrimination in not having been selected finance director; (2) the hearing examiner and Commission displayed a visible bias in favor of Ralston's position and that, as a result, a new hearing is warranted before an objective and impartial hearing examiner; and (3) in the event this Court upholds the Commission's finding of sex discrimination, the Commission's calculation of damages should be vacated, especially since Ralston failed to prove she made a bona fide attempt to mitigate damages.

"The scope of our review of an adjudication of the ... Commission is limited to determining whether there was a constitutional violation or an error of law and whether the necessary findings of fact are supported by substantial evidence in the record." *Balas v. Department of Public Welfare,* 151 Pa.Commonwealth Ct. 53, 60, 616 A.2d 143, 147 (1992), *petition for allowance of appeal denied,* 535 Pa. 639, 631 A.2d 1010 (1993). After having examined the present record, we fail to find sufficient evidence to support the Commission's affirmance of the hearing examiner's decision sustaining Ralston's allegations of sex-based discrimination.

This Court, ever cognizant that the well-reasoned disposition of discrimination cases requires careful evaluation of shifting evidentiary burdens, stated, in *Consolidated Rail Corporation v. Pennsylvania Human Relations Commission,* 136 Pa.Commonwealth Ct. 147, 582 A.2d 702 (1990), that:

It is well settled in Pennsylvania that cases arising under Section 5(a) of the Act be considered in accordance with the

analytical framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and adopted by the Pennsylvania Supreme Court in *General Electric Corp. v. Pennsylvania Human Relations Commission,* 469 Pa. 292, 365 A.2d 649 (1976). Under that analytical model, the burden is initially on the plaintiff to prove a *prima facie* case, which if proved, raises a presumption of discrimination. The *prima facie* case is established by showing:

> (i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [the plaintiff's] qualifications.... This standard is, to be sure, adaptable to accommodate differences in the nature of the discrimination alleged (e.g., sex rather than race) and in the action alleged to be improper (e.g., discharge rather than refusal to hire). The form it takes, however, must be appropriate to its function, which is to 'eliminate the most common nondiscriminatory reasons for the employee's [sic] action.'

> *Allegheny Housing Rehabilitation Corp. v. Pennsylvania Human Relations Commission,* 516 Pa. 124, 129, 532 A.2d 315, 318 (1987) (citations omitted).

*Id.* 136 Pa.Commonwealth Ct. at 155, 582 A.2d at 705–06. In the present case, the Commission erroneously found that Ralston successfully made out a *prima facie* case giving rise to a presumption of sex-based discrimination. After review of the record, we conclude that the evidence does not support the Commission's findings and conclusions and that Ralston did not make out a *prima facie* case of discrimination. The Borough presented the Commission with evidence of objective, nondiscriminatory reasons for its elimination of Ralston's prior position and for its not hiring Ralston as finance director.

Specifically, the record indicates that sweeping changes resulting from passage of the Charter affected a considerable

number of Borough personnel in addition to Ralston, as shown by the following February 19, 1992 deposition testimony of the Borough administrator, John Plonski:

Q. Was it your understanding of the situation that if she [Ralston] was not appointed to the position of Finance Direction she would have then been terminated or she ...

A. Well, the—the Home Rule Charter was taking effect ... with a new government everything becomes new so that people in certain positions were not "continued" and those that were not in Borough employment were not "terminated". ... this was a clean slate and people were put in under a new form of government with a fresh start with different responsibilities and authorities and different leadership certainly.... So when you asked the question about terminating Mrs. Ralston I don't know if her job—really her job the one that she had really ended as of that date. It wasn't as if she was terminated. It was as if the current job that she had became nonexistent. It was in fact succeeded by a different job with different responsibilities and authorities and ... the incoming Mayor ... chose to put in another person.

Q. Do you know of anybody else's job ... that was eliminated if you will as a consequence of the enactment of the Charter?

A. Well, in the same way the Borough Manager's position was eliminated.... and was replaced by a new position called Municipal Administrator which was quite different in scope than the prior one.... They [other positions] were really substantially changed, every one of them.

The above underscores the fact that Ralston was not the only Borough employee whose job was affected by the new Charter, a highly relevant consideration in this case, because "[i]t is normally incumbent upon a complainant in a disparate treatment case to compare his treatment with others similarly situated in order to prove discrimination." *Pennsylvania Department of Health v. Nwogwugwu,* 141 Pa.Commonwealth Ct. 33, 40, 594 A.2d 847, 851 (1991). Moreover, the fact that Ralston's former position as treasurer, with circumscribed

responsibilities, was subsumed by the Charter's newly created, more responsible finance director position was further clarified during the March 11, 1992 hearing by the following testimony of William M. DeAngelis, the Borough's current mayor:

Q. Please, ... clarify the positions of finance director as after the Home Rule Charter was adopted, and the previous position that was held by Ms. Ralston....

A. The position of treasurer that was held by Mrs. Ralston.... We consolidated subsequently, tax collection and all vestments [sic]—all monies incoming and all monies outgoing, as well as policy decisions in the hand of the director, whereas under the old form of government, the policy decisions were ... essentially ... of the council, rather than of the finance director....

. . . .

It's my recollection that the role of the treasurer [held by Ralston] ... was a functionary, rather than as a policy maker....

We next address the Borough's allegations of the hearing examiner's bias and note that little evidence of record supports the following conclusions stated in the hearing examiner's opinion:

Turning to the Borough's final assertion that Dreby was chosen because of his banking experience, Ralston is successful in showing that this too is pretextual. As noted earlier, neither the Home Rule Charter's list of qualifications for the Director of Finance position, nor the July 1987 newspaper advertisement for the position states that banking experience is a requirement, let alone a positive attribute. Common sense dictates that banking experience would not be as important as direct municipal experience.

The above comments fail to recognize it was a legitimate and reasonable Borough decision to base its selection of finance director upon Dreby's academic and banking background which, by any objective standard, were superior to and better

suited to the foregoing position than were Ralston's qualifications. In this regard, we note the following testimony elicited from one of Mayor Marberger's aides during the March 13, 1992 hearing:

A. John Marberger felt that the person in charge of the financial operations of the Borough of Norristown under the Home Rule Charter should be a person who is heavily involved with banking, a person who is experienced in money management.

. . . .

... And he [Mayor Marberger] felt that Ben Dreby because of his extensive banking experience and that he was a banker would fit the position that he was looking for as far as the Home Rule Charter position for the Director of Finance.

. . . .

Q. Did Mayor Marberger indicate to you whether or not he had considered Mrs. Ralston for the position?

A. Yes.... And he did review her qualifications. He compared her qualifications with Mr. Dreby's and he—it was a very difficult decision for him to make. But he made it on the basis of what he thought the job required. He felt he needed a person who had extensive money management experience and he felt that Ben Dreby was that person.

Based upon the foregoing discussion, we find the Borough's action in eliminating Ralston's former job through consolidation and expansion of responsibilities and its selection of a finance director candidate with unarguably more suitable academic and employment experience than Ralston's, to be non-discriminatory. Accordingly, the order of the Commission is reversed.

## ORDER

AND NOW, this 12th day of July, 1994, the order of the Pennsylvania Human Relations Commission in the above-captioned matter is reversed.